STUART GOLDFARB (SBN 38571)
Attorney at Law
16633 Ventura Blvd., Suite 1405
Encino, California 91436
Telephone (818) 788-9909
Facsimile (818) 788-3930
Email: sgolday@aol.com

Attorney for Defendant
MARSHA GAY REYNOLDS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:16-mj-00607-DUTY-1 |
|---|---|
| Plaintiff, | DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION FOR REVIEW OF MAGISTRATE'S ORDER SETTING BOND |
| v. | |
| MARSHA GAY REYNOLDS, | Date: April 8, 2016 |
| Defendant. | Time: 1:30 p.m. |
| | Court: Hon. André Birotte Jr. |

    Please take notice that Defendant MARSHA GAY REYNOLDS, by and through her attorney of record Stuart Goldfarb, will hereby move this Honorable Court on April 8, 2016 at 1:30 p.m. to grant release on bond under the same terms that were set by the Magistrate Judge in the Eastern District of New York on March 24, 2016. This motion is based on the attached Memorandum of Points and Authorities, the appended letters of character reference, the files and records of this case, and on such argument and evidence as may be presented at the hearing.

Dated: April 7, 2016          Respectfully submitted,

                       By      /s/
                              STUART GOLDFARB
                              Attorney for Defendant
                              MARSHA GAY REYNOLDS

1

# I.

# INTRODUCTION

On March 23, 2016, Defendant Marsha Reynolds turned herself in to agents of the Drug Enforcement Administration (DEA) at their offices located at John F. Kennedy International Airport in New York City. Ms. Reynolds was accompanied by her mother, Vanessa Reynolds, who went with her by taxi to the DEA office. The logistics of her self-surrender were worked out during a series of phone conversations between DEA case agents and undersigned counsel that were initiated the day before on March 22nd. From the earliest communications, counsel conveyed to the agents Ms. Reynolds' decision to self-surrender. At the time, the Government had not yet obtained an arrest warrant.

On March 23rd, Ms. Reynolds submitted to arrest for possession with intent to distribute cocaine, in violation of 21 U.S.C. §841(a)(1). The following day, March 24, 2016, counsel in New York for Ms. Reynolds submitted a bail package, and a bail order in the amount of $500,000 was set by the Honorable Viktor V. Pohorelsky, Magistrate Judge for the Eastern District of New York. That same day, the Government requested a review of the Magistrate's bail order, and a new hearing was scheduled before the Honorable André Birotte, Jr. in the Central District of California.

After spending her initial days in custody at M.D.C. - Brooklyn, followed by additional days at various custody facilities while in transit across the country, Ms. Reynolds arrived in this District on April 2, 2016. She has been housed at the Metropolitan Detention Center, Los Angeles, since that time.

The facts surrounding Ms. Reynolds' self-surrender are a highly pertinent sign of her willingness and commitment to abide by any bond requirements imposed by this Court. Undersigned counsel was in regular contact with the case agents over a period of 24-plus hours before a warrant was even issued for Ms. Reynolds' arrest. Counsel arranged for her surrender at JFK Airport based on the agents' instructions

which Ms. Reynolds followed precisely. In a letter to the Court (attached), the defendant's mother Vanessa Reynolds recounts:

> Marsha came to me and said she wanted to turn herself in and I went with her. As her mother I believed that was the right thing to do and for these reasons I humbly ask Your Honor to grant her request for reasonable bail.

Marsha Reynolds turned 32 on March 30th, one week following her arrest. She is a United States citizen, as is her mother, and she has resided continuously in the United States since she was 17 years old. She has no criminal record of any type. Ms. Reynolds has always led a quiet, rather sheltered life with her family, and has resided to the present date with her parents in the New York City borough of Queens.

Ms. Reynolds' mother will pledge as surety for bail the home that she purchased in 2005, where she has lived ever since with her husband and with Marsha. As detailed below, three very close friends of the defendant's family are also willing to offer properties, all located in New York City. These four properties together have equity of more than $600,000.

It is inconceivable that Ms. Reynolds would break a promise to her parents and to lifelong family friends, who have pledged a significant portion of their hard-earned assets to ensure that she will honor all appearances and commitments arising from this case. One of those friends, Deloris Whyne, worked as a nurse alongside Marsha's mother Vanessa Reynolds for 20 years. Ms. Whyne is offering a house that she owns in Brooklyn on Marsha's behalf. In an interview conducted in preparation of this report, Deloris Whyne (718/462-8861) remarked:

> I would not risk losing that home. I have family living there and I keep it for that reason. My husband was a carpenter and he fixed it up after we bought it several years ago. I don't use the house for income, but for my family. Right now a cousin and one of my granddaughters are

3

living there. I trust Marsha. I know she would not do anything to hurt me.

Marsha's maternal grandmother, with whom she lived for a number of years while growing up, died in 2009. She was the last close relative that Marsha had in Jamaica. Marsha's paternal grandparents died many years ago, and her mother had no relationship with her own father, whom Marsha never even met. Marsha has no siblings. The only relatives that now remain in Jamaica are cousins with whom Marsha has a distant relationship. It would be unthinkable for her to flee to Jamaica or anywhere else. If such were her mindset, she would not have hired an attorney while still out of custody for the purpose of arranging her surrender. Moreover, she has already voluntarily surrendered her passport to the DEA, and as a standard bond condition she will likely be banned from any air travel or proximity to airports, bus or train depots, and seaports without first obtaining authorization from Pre-Trial Services and the Court.

On the above grounds, undersigned counsel respectfully requests that this Honorable Court rescind the stay set by Judge Pohorelsky upon the Government's request for review, and reinstate bail in the amount of $500,000.

## II.

## PROPERTY TO BE PLEDGED FOR COLLATERAL

The following individuals are prepared to offer a total of four homes as sureties to guarantee the defendant's appearance at every court hearing. All have the fullest confidence that Ms. Reynolds will honorably abide by the conditions of her bond and will be present and punctual for all court proceedings.

1. Deloris Whyne, a registered nurse, worked with Marsha Reynolds' mother, who is also a nurse, for 20 years. Ms. Whyne offers as collateral for bail a residence at 9229 Foster Avenue in Brooklyn, New York that she solely owns. The estimated market value of the property is $522,000.

Subtracting the amount still owed to the lender, the approximate equity value is $313,000.

2. Susan Slater is the pastor of Good Way Christian Fellowship Ministry in Queens, New York, the church that Marsha Reynolds and her parents attend. Ms. Slater is offering for bail the house where she resides at 109-44 142nd Street in Queens. The estimated market value of her home is $371,000 and the approximate equity value is $304,000.

3. Pauline Williams is Marsha Reynolds' godmother. She has been a friend of the Reynolds family since before Marsha was born. Ms. Williams is offering the home where she lives at 109-65 153rd Street in Queens, New York. The estimated market value of her home is $544,000 and the approximate equity is $116,000.

4. Finally, Marsha's mother, Vanessa Reynolds, offers the home that she purchased in 2005 where she, her husband, and until her recent arrest Marsha, all resided. The house is located at 120-14 166th Street in Jamaica, Queens, New York. The estimated market value of the property is $362,000. Approximate equity in the property is $17,000.

## III.

## A REVIEW OF THE DEFENDANT'S PERSONAL BACKGROUND UNDERSCORES HER STRONG TIES TO THE COMMUNITY

Ms. Reynolds' personal background is relevant to the issues of flight and danger to the community and is therefore summarized here. The information below is derived from interviews of the defendant, her family and friends, as well as a review of documentary evidence and the appended character reference letters.

Marsha Reynolds, age 32, was born on March 30, 1984 in St. Catherine, Jamaica. She is the only child of Joseph Reynolds, 57, and Vanessa Reynolds, 56. Joseph works as a security guard at Rochdale Village, a housing complex in New York City. In Jamaica, he was a police officer in the capital city of Kingston for

5

thirty years. Vanessa Reynolds is a registered nurse who works full-time in a nursing home and has a second part-time job as a home healthcare aide. Before immigrating to the United States, Vanessa Reynolds was a schoolteacher for ten years in Kingston.

Marsha lived in Jamaica until she graduated high school in 2001. Her mother had moved to New York City a decade earlier, in 1990, in search of better opportunities for herself and her family. Marsha and her father remained together in Jamaica until Marsha finished high school and came to join her mother in New York. Because her father worked as a police officer with an unpredictable schedule and frequent night shift duty, Marsha lived mostly with her maternal grandmother in the countryside outside of Kingston. She and her father would travel to visit her mother Vanessa Reynolds periodically, and Marsha spent every summer with her mother in New York.

As a girl growing up in Jamaica's rigorous academic system, Marsha went to school five days a week and then worked most of the day on Saturdays with tutors. By every account, she was a dutiful and conscientious student as well as a talented athlete. On Sunday she attended pentecostal church services with her grandmother.

During her school years, corporal punishment was still a staple of the educational system in Jamaica. Marsha recalls being doubly motivated to perform well in school -- not only to please her parents, but also to avoid the beatings administered to pupils who failed to complete their homework. As an only child, Marsha was the focus of great encouragement and expectation from both parents, who hoped she would someday become an attorney.

Since 2001, Marsha has lived with her parents in the Jamaica neighborhood of Queens, New York. She moved to New York soon after she graduated from St. Catherine High in Spanish Town, Jamaica in 2001. Her father stayed in Jamaica until retiring from his law enforcement career in Kingston, though he continued his periodic visits to New York. Upon fulfilling his thirty years with the police

6

department, he left Kingston to join the defendant and her mother permanently in New York.

Marsha was still 17 years old when she moved to New York. She enrolled at Mercy College, a Catholic school founded by the Sisters of Mercy with campuses in both Manhattan and the Bronx, where she earned an associate's degree two years later. Marsha then transferred to New York University where she majored in Sociology with a minor in English literature.

After earning her bachelor's degree from NYU, Marsha worked for a few years as a tutor in an afterschool program sponsored by the City of New York, and also as an aide in an assisted living facility. Collette Brown-Igweh, who is a medical technologist and a graduate student at George Washington University, writes:

> Ms. Reynolds strongly believes in giving back to the
> community. A few years ago, Marsha and I tutored at an
> after school program at Southern Queens Park Association,
> New York. We helped the underprivileged kids in our
> community with their homework and encouraged them to
> do better in school. Also, Marsha tutored adults who were
> preparing for GED. This is the Marsha I know – a woman
> who loves people and has a passion for giving and helping
> others…Marsha has always obeyed the law. She has built
> a good reputation for herself in this country; therefore, she
> has absolutely no reason to abandon her family and all that
> she has worked to have and diligently to achieve.

For the past six years, Marsha has been employed part-time as a flight attendant for JetBlue Airways. Simultaneously, she has been studying towards a nursing degree. She took additional courses in that field from Mercy College, and at the time of her arrest, she was enrolled at College of New Rochelle. She was

studying to become a nurse practitioner and has a little over a year left to finish her program. Ms. Brown-Igweh adds in her letter:

> She is not a mediocre student, she perseveres and manages to work and study laboriously because education is very important to her and to us as a family. We all work relentlessly for everything that we have. Marsha continued with her studies at New York University where she obtained her Bachelors. Currently Marsha is pursuing her degree in nursing and ultimately her dream is to become a nurse practitioner. I could not have been prouder of her for advancing her education.

Marsha is now on a leave of absence from College of New Rochelle but would like to return to school while her case is pending.

## IV.

## INTERESTED PARTIES

Letters received in support of bail for the defendant reflect a strong current of support for Ms. Reynolds. All of the letters are attached and a few are excerpted here.

Marsha's cousin Colleen Campbell is a Ph.D. candidate at Princeton. She writes:

> There are not many people for whom I can say this, but Marsha has always maintained a warm, kind, and compassionate disposition. In fact, she is one of the humblest persons I know. The last time I spoke with her, she encouraged me to continue with my studies and offered to support me with my research plans. She always encouraged me to thrive in my studies. The Marsha I know would never fail to show up to Court or cause any harm to

8

anyone in the community. She has invested too much in creating a decent life for herself and a well-respected name. Not only that, she is profoundly and intricately connected to her family, her church, and her community.

Tamikia Pommells has known Marsha since they were students at Mercy College. She comments in her letter:

> If Marsha says she is going to do something, she won't disappoint you. She is very committed to her words… It is my belief that Marsha will make all her court hearings. If she wanted to run away she would not have turned herself into authorities.

Family friend Derick Williams, a business owner, observes:

> I believe that with the support of her many friends and unwavering love of her family coupled with her high standard of moral characteristics not to mention her willingness to continue to be a law abiding citizen, if granted bail Marsha Gay Reynolds will be present for every court date or whenever she is required to be available under the law.

## V.

## PRETRIAL DETENTION IS RARELY APPROPRIATE AND IS NOT WARRANTED IN THE CASE AT BAR

The tradition of federal law is that a defendant arrested for a noncapital offense shall be admitted to bail, and only in rare circumstances should release be denied. United States v. Townsend, 897 F.2d 989, 993 (9th Cir. 1990). Any doubts regarding the propriety of pre-trial release should be resolved in favor of the defendant. Id. at 1994.

On a motion for pre-trial detention, the government bears the burden of showing by a preponderance of evidence that a defendant poses a flight risk, or by clear and convincing evidence that the defendant poses a danger to the community. United States v. Aitken, 898 F.2d 104, 107 (9th Cir. 1990); United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir.1985). If that burden is not met, bail must be set.

"The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pre-trial detention." United States v. Orta, 760 F.2d 891 (9th Cir. 1985). Release conditions available include curfews, travel restrictions, reporting requirements, and increasingly, the use of GPS anklet tracking and monitoring systems. See 18 U.S.C. §3142(c)(1); United States v. Ojeda Rios, 846 F.2d 167, 169 (2d Cir. 1988). In addition, the Bail Reform Act "requires the release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community." United States v. Gebro, 948 R.2d 1118, 1121 (9th Cir. 1991); 18 U.S.C. §3142(c)(1)(B). Under this standard, the government is unable to carry its burden of showing that no "condition or combination of conditions" will reasonably assure Ms. Reynolds' appearance at trial or the safety of the community.

If it is determined that conditions exist that would reasonably assure a defendant's appearance, the Bail Reform Act "specifically prohibits the court from imposing a financial condition that results in the pretrial detention of the defendant." United States v. Fidler, 419 F.3d 1026, 1028 (9th Cir. 2005) (quoting 18 U.S.C. §3142(c)(2) alterations and internal quotation marks omitted).

- **The Defendant Poses No Danger To The Community**

Although the Bail Reform Act added "safety of the community" as a factor to be considered in imposing detention, the cases interpreting the statute consistently reiterate that "the passage of the pretrial detention provision of the 1984 Act did

not...signal congressional intent to incarcerate wholesale the category of accused persons awaiting trial." United States v. Orta, supra, 760 F.2d at 890.

As the Orta Court explained: "[T]he legislative history stresses that the decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial. It is anticipated that pretrial release will continue to be appropriate for the majority of Federal defendants." Id. at 890 (citing S.Rep. No. 225, 98th Cong., 1st Sess. p. 12).

Consistent with this, the statutory scheme continues to favor release over pretrial detention, providing the judicial officer with alternatives to structure an appropriate pretrial release. Id. at 890. Doubts regarding the propriety of release should be resolved in favor of the defendant. The appropriate procedure in detention hearings requires that the Court follow a statutory progression from release on personal recognizance to conditional release before the Court can even consider detention. Orta, 760 F.2d at 890-91; United States v. Maull, 773 F.2d 1479, 1482 (8th Cir. 1985) (en banc).

Ms. Reynolds is not a repeat offender or sociopath. On the contrary, she is a young woman with a solid academic and employment history who has worked hard to better herself and achieve positive goals. She graduated from a respected university, and has completed most of the postgraduate study required to become a nurse practitioner.

As the attached letters repeatedly note, Marsha Reynolds is an only child who is extremely close to both of her parents, with whom she still resides at the age of thirty-two. She also has substantial positive ties to the community, particularly through her church. She has no prior police contacts, the offense does not involve violence, and she does not own or possess firearms or any type of weapon. Any remaining concerns that she poses a flight risk or a threat to the community could be addressed and ameliorated by a heightened degree of monitoring. Her movement could be kept to a minimum by requiring her to wear an electronic bracelet, imposed

as a special condition of her release on bond. She could be required to agree to a residential search at any time as a condition of her bond. These and any other measures the Court may deem appropriate would reasonably assure that Ms. Reynolds would pose minimal risk or danger to the community, particularly in view of the absence of any controversial behavior in her past.

- **The Risk of This Defendant Fleeing is Negligible**

Ms. Reynolds' release on reasonable bail pending trial would create no meaningful risk of her failing to appear. Her strong family and social ties are an indicator that she can be expected to remain within the community pending the outcome of her case. The Court is also reminded that Ms. Reynolds surrendered under her own volition in New York.

Ms. Reynolds is more than willing to remain under electronic monitoring during this period if the Court so orders. She also readily agrees to accept any other restrictive conditions on her release. In combination, these restrictions obviate any contention that she would pose a risk of flight. See United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990). In O'Brien, the First Circuit Court of Appeals upheld the pre-trial release of Edward O'Brien, a high-ranking federal drug agent charged with narcotics trafficking, subject to the condition he wear an electronic monitoring bracelet, even though he had no substantial community ties, had overseas connections, the evidence of his guilt was strong, he lived near an international airport and had a seasoned understanding of the inner workings of law enforcement. Id. at 816. Although the appellate court concluded that O'Brien posed a risk of flight, the Court of Appeals concluded that the wearing of an electronic bracelet, combined with other conditions, rebutted the presumption of flight risk and concluded that the government had not met its burden of showing that no condition or combination of conditions would reasonably assure his appearance. Id. at 817.

Ms. Reynolds is willing to accept the most restrictive release conditions and respectfully submits that she poses no risk of flight and that the government is unable

to meet the burden of showing that no condition or combination of conditions will reasonably assure her appearance at trial.

## VI.

## CONCLUSION

The unique circumstances related to Defendant Marsha Reynolds' self-surrender to the authorities weigh strongly in favor of her release on bond. It cannot credibly be argued that there is a significant risk of flight when Ms. Reynolds and her family retained not one, but several attorneys for the express purpose of arranging for her to present herself to law enforcement. Marsha Reynolds was unhesitatingly cooperative and compliant through every stage of the self-surrender process, at all times doing exactly what law enforcement requested as relayed to Ms. Reynolds by her attorneys.

The defendant's personal history and characteristics also strongly support her eligibility for release on bond. Marsha Reynolds is a United States citizen who has lived in this country for her entire adult life. She resides with her parents in New York in a home that her mother purchased in 2005. Her parents are willing to put up this home as guarantee that Marsha will appear at all court hearings. Three longtime friends of the family will also put up properties as collateral, each of which has substantial equity and two of which are primary residences. Marsha has a large community of supporters, both from her college years and fellow church members, who will offer their encouragement, guidance and support to assure that she meets any and all conditions of her release.

For the foregoing reasons, Marsha Reynolds respectfully asks the Court to release her from pre-trial custody pursuant to 18 U.S.C. §3142(c), and to reinstate bail at a reasonable amount to be secured by the properties listed above. Release under reasonable bail and whatever other conditions the Court wishes to impose would adequately guarantee her presence at all future court hearings and would permit her to meet with undersigned counsel for the purpose of actively assisting in

the preparation of her legal defense, as well as to continue her nursing studies while her case is pending.

DATED: April 7, 2016         Respectfully submitted,


                    By      /s/
                         STUART GOLDFARB
                         Attorney for Defendant
                         MARSHA GAY REYNOLDS